May it please the Court, Adam Schulman for Appellant, David Lowery. In class actions, the side-pray option arises only if it isn't possible to put those funds to their very best use, benefiting the class members directly. In other words, payments to class members are categorically superior to side-pray payments to third parties. This principle follows from the nature of Rule 23, as adjoined or devised, and from the fiduciary duties owed to absent class members themselves. But the rule that the parties espoused and the District Court accepted would open the floodgates to side-pray and thus drown out meaningful class recovery. It would allow parties to substitute side-pray for class recovery whenever class distributions would be quote-unquote burdensome or quote-unquote costly, and whenever the fund could not be easily divided per capita amongst every class member. Other circuits have rejected that approach, and this Court should too. Neither settling parties nor a District Court have the discretion to conclude that maximizing class relief is not necessarily desirable, as the Court did below. As Judge Jones observed in her concurrence in the Fifth Circuit's Clyer decision, it is inherently dubious to apply a doctrine associated with the voluntary distribution of a gift to the entirely unrelated context of a class action settlement. Isn't the basic question of whether a side-pray relief is available and also whether it's largely available without any monetary relief settled in the circuit? No, the only opinions that would be on point, Molsky specifically said that question was left open. That was a while ago. What about Lane? Lane did not decide that question because the objectors did not dispute that issue in Lane. The objectors only raised two issues in Lane. Whether it was permissible to have side-pray where the defendant was involved in the organization being established, so sort of a conflict of interest point, and whether the total sum of nine or so million dollars in that case was adequate. The objectors in Lane conceded that it was non-distributable to class numbers, which we have preserved here. Now Google Refer decided that issue, but of course that's been vacated by Frank Begaus. So we return to Molsky's situation, and this panel is free to decide the issue contrary to how it decided it in Google Refer, and I think there's good reasons for that. I think Google Refer didn't have the benefit of Justice Thomas's opinion in Frank Begaus, which in our minds is very compelling as to why side-pray does not count as a form of relief. It's categorically inferior to class relief. What if it's the only practical relief that's available? What about if it's a class, such as this one, where the amount per person, or even the ability to identify the class is, for practical reasons, impossible? What about that? Well, the amount available was not infeasible to distribute. That's where our evidence, ER 143 to 145, the list of cases where plaintiffs have been able to distribute this amount of money over relatively similar amounts of class members. In this case, there's a problem with even trying to identify the class members. It's going to be tremendously time-consuming and expensive, and so if you want to talk, you can go at it either way, but it seems to me to be, there's a strong record here that that approach would have been very impractical and inefficient. So what's your best response, please? I do want to get to the self-identification. Two responses to that, Your Honor. First, the response that we focused on in our brief. The absent class members have to be treated equivalently to the named plaintiffs. The named plaintiffs were permitted to self-identify to establish their class membership. They were allowed to do that in the context of standing, and also there was a three-year process with the special master that was enormously expensive that provided additional evidence to substantiate that they were actually class members. So I'm not sure how that would translate into the 60 million class members to determine, you know, all of the factors of whether they're a class member. The settling parties didn't rely on that process whatsoever in demonstrating that they had standing to consummate the settlement or in demonstrating that the named plaintiffs were, in fact, bona fide class members, such as that they would be entitled to their incentive awards of between $500 and $5,000 a piece. Okay, but there's a difference. I mean, there's due process concerns from the defendant's perspective, right? So there's a difference between what's acceptable to establish standing and what would be acceptable to establish class membership. I don't think at the settlement stage that it makes sense to have two different standards. We noted that a little bit in our reply brief, but I do have a second response to this whole self-identification issue, which is in the context of privacy settlements, it's not unusual at all to have a class definition. For example, two cases, the Fraley case, which we rely on, the class definition in Fraley was class members whose names, likenesses, and images appeared in a sponsored story, which was Facebook had this program by which if you clicked a like on a certain product like Coke, they would create a story on your friend's timeline that you liked Coke. Well, there was no way for those class members to know that they were featured in sponsored stories because they only appeared on their friend's timelines. But there was a claims process in that case, and it required an ass test station that the class members may have upon information and belief may have been in a sponsored story. Essentially the same exact procedure that the name plants were allowed to use here through the complaint to verify their status as class members. Ultimately, and this is what the district court said, you recognize that if you were to distribute all this money among the 60 million people, everybody would get 10 cents, right? 20 cents, 22 cents. Yeah. And your main representation as to why this is actually distributable is that in fact, only 1% of the people would claim the money. So you're setting up some advantage to having 99% of the people get nothing over everybody, at least getting whatever these organizations that get the money may do for privacy protection in general. And also there is some injunctive relief here that extends the already obtained relief for a couple of years, which is not nothing. So the notion that a distribution, which nobody is going to actually take up or 1% of the people are going to take up is an advantage. I don't understand. Well, I'd quibble with you there. First of all, what we propose, which is just one proposal is to allow all 60 million class members, the opportunity to file accounting. It's correct that that proposal is only feasible because 1 to 5% of that number, which is between 600,000 to 3 million, that's not a small number of class members will take them up on that offer. But that doesn't mean that that isn't preferable to a situation where zero class members obtain a benefit, which is what the parties have proposed and what's been rejected by the fifth, seventh, and eighth circuits. Wasn't there, my understanding is there were two objectors to this. Is that right? You and somebody else. I mean, you are a client and one other person, or maybe you represent both of them, we only represented one client. I'm not sure. I'm not certain of that. I believe there were two. That's probably correct. Yes. I'm sorry. That's probably correct. So that suggests that, that if you're looking at this as some preference by the people who are actually affected about whether they'd rather have their 10, 20 cents for $10 or have the money go to some useful purpose, they seem, 59,998,000 of them seem to prefer that. Well, in my mind, that reviews, reveals a general indifference, but because obviously it's not, they would prefer five or $10 to nothing, but they're not going to prefer, they're not going to bother writing an objection to the district court for that five or $10. Well, the opt-out, the opt-out doesn't obviously doesn't resolve fairness concerns. Ampen was an opt-out settlement. This court has projected plenty of, of opt-out settlements. So I guess I would just say, although the law may allow for a limited birth for Cypre as a method of tidying up residual sums after a comprehensive class recovery process, rule 23 can't be interpreted to accept class settlements and certifications that proposed a preterm at that process and prioritize non-class benefit ahead of class benefit all the while, while waiving millions of class members, significant statutory damages claims. And I'd be happy to answer any other questions. If not, I'll reserve the rest for the court. Can the court tell me whether the clock includes Ms. Sawyer's 6.5 minutes or not? Yes, I had separately. I'm very confused. This shows that Mr. Schulman has 20 minutes and Ms. Sawyer appearing in his size was five minutes. Right. So that's in addition. Yes, ma'am. Okay. Ms. Sawyer, do you want to go next? Yes, thank you. May it please tell me what the interest of the state of Arizona is? Yes, your honor under the statute that we get noticed about that anytime there's a class settlement, the attorneys general are so that we can write different provisions in a consumer protection rule. And so under CAFA, we received notice of this settlement and therefore have waived it as an amicus in that case. Sorry, I'm having a hard time hearing you. You're sort of breaking up. Can you get a little bit closer to the microphone? That might help. Let me try here. Is that a little bit better? Yes. Okay. I'll speak a little bit closer. I'm sorry. We're here today to briefly address two concerns for the court. First, it was error to place value on the injunctive relief in the given that it was almost entirely duplicative of relief that was previously attained. But it wasn't entirely duplicative. So I would point out, your honor, that there's absolutely no new relief here. But it's extended for two years, right? That's the, okay. So why is that not? Why is that without value, please? Some of the provisions are completely duplicative, such as the collecting the data and destroying the data. So those are not extended at all. There was no sunset or no expiration on those provisions. The provisions that are extended for a period of time are, for example, the privacy program, which was negotiated in the AG settlement back in 2013. The issue there would be that they would continue to stay updated about privacy concerns. They would continue to inform their employees of these issues. So that is extended for a few years. I would point to, however, that this was back in 2013. So these issues have evolved very much since that time. And it's hard to think that without adding this, that Google would not sit and talk about these issues and continue to update their employees about privacy concern. We have to consider that. I mean, the Campbell case from 2020 from our circuit said, we don't consider the value of the injunctive relief in a vacuum. We look at the value of what the class members are giving up. And it's not much given the risk, the expense, the difficulty of the litigation. There's very little that they're giving up in potential recovery. Why doesn't the Campbell case resolve that issue for us? Sure. I would say that for one, the injunctive relief in Campbell is a little bit different than this case, given that the injunctive relief there was something new, something Facebook wasn't doing. They were adding new disclosure. Whereas here again, there is nothing new being added. And as far as just weighing whether it's sufficient, looking at the sufficiency of whether the injunctive relief was enough for the settlement doesn't necessarily mean that it provides more value. The only value in the settlement is the $13 million. As I was saying- I didn't understand that. Can you back up just before you missed that point or passed that point? The extension of two years is not valuable because of what? I would say it's not meaningful value in this case. It's nominal or theoretical. I believe Justice Thomas pointed this out in his dissent in front of first scouts that there is a difference. Nominal because you think that this dates back to 2013 and you're assuming that this would have to another case in the circuit, Kobe versus ARS that talks about different value and injunctive relief. These provisions, the only two provisions that are being extended here are the privacy program and some educational updates. Right. But in fact, there is other relief. There's a cyphering relief. And in fact, in terms of the fees, which is where the injunctive relief value becomes a question, they're not trying to base their fees on any value attributed to the injunctive relief. So they're basing it only on the fund. So why are we worrying so much about the injunctive relief? Your Honor, my point about the injunctive relief is just that the class members are not receiving any benefit from that. And then to our second point, which we point out in our brief, is that without any value, without any substantial or meaningful value in that injunctive relief, the monetary award is the only award and class members are not getting benefit from that. We would take the position that when there is $13 million available and class members are not receiving or given the option to receive that, then the settlement cannot be fair, reasonable, and adequate under Rule 23. We definitely think there's value in getting... But you're arguing for a per se rule. There can never be any circumstances of a cyphering settlement at all, ever. Definitely under these circumstances, Your Honor, where there is this much money on the table, perhaps there is a case, for example... The amount of money in the table will give everybody $0.20. It's almost certain that it will cost more than $0.20 to distribute that money. So if you're trying to benefit the class as a whole, there's no way to do it. Is that accurate? Your Honor, I would agree with Mr. Schulman's points on that. Given that the claims rates are typically very low, 1% is not uncommon, putting 15 hands... But then you're valuing giving 1% of the class $10 and saying that that's, for some reason, per se better than a CyPREA award. It's not only 1% of the class. So you're not, in fact, benefiting the class as a whole and you can't. Your Honor, I would say that giving... Aside the ID problem, and you're over your time, so please finish the sentence. Okay, Your Honor, just in sum, I would just again point out that we don't feel that there was meaningful relief in the injunctive provisions and that given these facts, a settlement that consists solely of a CyPREA award is not able to be approved under Rule 23. Thank you. Okay. Now, my understanding is that we are going to have Mr. Willen next and Mr. Small after that. Is that accurate? Your Honor, Dan Small, the plaintiff's appellee. Actually, the agreement between the plaintiffs and Google was the other way around. But you have less time. You have 6.5 minutes. I'd like the 6.5 minutes on the clock, please. No, actually, I have 13 and a half and Google... Well, that's not what's showing on my date sheet. It must have been changed at some point. Okay, so you have 13.5 minutes, even though mine says 6.5 minutes. Let's put that on the clock. Okay. May it please the court, Dan Small for the plaintiff's appellees. I want to start by addressing two questions the court asked of Mr. Shulman. First, plaintiffs and Mr. Lowry don't agree on much, but we do agree that any claims process in this case result in a claims rate under 1%. That means, undeniably, that over 99% of the class is better off with a side claim. Mr. Small, I am having trouble. Your connection is resounding and echoing and making funny noises. Do you have a cell phone on, sir? I do, although it's not near the... Sometimes that's the problem. We're getting an echo. I'm sorry. I don't know why it's doing that. It's not doing it before. Well, on my end, it's cleared up. Judge Berzon, can you hear an echo or Judge Beatty? I was hearing just his distortion. His voice was going in and out. Sometimes, to me, I just think you're moving naturally as a person would, but you're moving a little far away from the microphone. I know it's not natural, but stay close to the microphone. I will. Let me try that again. Plaintiffs and Mr. Lowry don't agree on much, but we do agree that any claims process in this case would result in a claims rate under 1%. That means, undeniably, that over 99% of the claims is better off with the SIPRE distribution, which, if designed appropriately as it is here, gives them a real benefit. Some benefit, obviously, is better than none. At some point, and not a very large one, it would cost more to distribute the money than to give the amount of money there is. That's correct, Your Honor. As you pointed out, on average, per class member, there is $0.22 available before attorney's fees and expenses were paid. That clearly is going to be less than the cost of distributing that amount to a class member. Could you speak to the value of the injunctive relief? We talked a little bit about that. There is not value to that injunctive relief. Could you give me your best shot on that? Yes. Let me start by saying that I agree entirely with Judge Berzon that the injunctive relief value really only goes to the attorney fee question. We ask for fees as a percent of the $13 million recovery. My question is different. My question is, how does the injunctive relief benefit the class? It benefits the class in three ways, Your Honor. Number one, it extends the injunctive relief that the attorney generals were able to obtain in 2013 by actually at least three years now. That relief that the attorneys general obtained will expire in 2023. The relief that we got under the settlement will go through at least 2026, depending on when there's a final judgment in the case. What's the second way, please? The second is that it brings the injunctive relief under the jurisdiction of the court in the Northern District of California. It is now enforceable by the plaintiffs and by the judge, the district judge, the district court. Got it. What's the third way? Third, Google is now required to report to plaintiffs on an annual basis as to their compliance with the injunctive relief. We will now be told by Google whether there is compliance, and we'll have an opportunity to address that if there is not. Thank you. The other question that I wanted to respond to directly was the court's question about whether the central issue in this case, whether the recovery is distributable to the First of all, Lane so held. It is not the case, even though there was agreement by the parties that the amount was non-distributable, this court still in Lane addressed the question because the objector in Lane had relied on Molsky, an earlier decision of this court, and Molsky had said that there was not evidence that the fund in that case was non-distributable. And this court in Lane distinguished Molsky on the ground among others that, quote, there is no dispute that it would be burdensome and inefficient to pay the $6.5 million in SIPRE funds that remain after the cost directly to the class members because each class member's recovery under a direct distribution would be de minimis. So the Lane court did reach that issue, and that's exactly how the court understood Lane in the subsequent Google Referrer case. In Google Referrer, this court said, quote, in Lane, we deemed direct monetary payments infeasible where each class member's individual recovery would have been de minimis because the and there were over 3.6 million class members. So this court in Google Referrer understood that Lane reached the question of distributability and found that the fund was not distributable in that case. Now we have the more recent decision by this court in Google Referrer. While it was based on other grounds, it remains a considered view of this court on the precise issue we have here, and it continues to have persuasive value. And there is no good reason for this court to depart from the decision that it made in Google Referrer. Now, Mr. Shulman represents that we are outliers in this regard among the circuits. Is that correct? It is not correct, Your Honor. The basic standard in all the circuits that address the question is whether the fund is distributable. And it clearly, under all the circuits that address the question, determine that if there is too little in the fund per class member to make a distribution practicable, that is a justification to distribute the money instead to class members. And second, if the money cannot be distributed to class members because they cannot be identified, that is another reason to distribute the money instead to SIPRE recipients. The law is remarkably consistent, actually, on the distributability issue across the different circuits that have addressed it. Now, I would like to also point to something that makes this case very different from all of the cases that Mr. Lowery relies on for his argument. And that is here, unlike in the other cases, class members do not have an ability to identify themselves. They do not know whether Google Street View vehicle drove by their house 11 to 14 years ago at the precise moment that they happened to send a communication through their wireless network. I see I'm down to five minutes and I want to leave the rest of the time to Mr. Whitman. Yes, please. Thank you, Your Honor. Wait a minute. I think we put the time on so that... Did you put just his time on so far? I had just put on 13.5 minutes for Mr. Small. So you can keep going if you please. Okay, thank you. You don't have to. So that's the key fact that distinguishes this case from all of Mr. Lowery's cases, that there is no ability to even identify the class members in this case. So that takes them out of the realm of the argument that Mr. Lowery has made that well, even though 99 plus percent of the class will not receive anything, if we had a claims process, they all have the opportunity, he argues, to submit a claim. And that is simply not the case, Your Honor. They do not have an opportunity to submit a claim because they don't know... Mr. Schulman's position is that that just demonstrates you shouldn't have been in class at all. Well, that's incorrect, Your Honor. There is no decision that has ruled that the inability to identify class members is a reason to not certify a class. In fact... We know there were 60 million class members. We just don't know who they are. That's exactly right, Your Honor. And this court in Google easily rejected that precise argument. And earlier... Of course, it might make sense to make the class be anybody who has some reason to think that they were... I mean, everybody who had... Maybe everybody in the country or nearly everybody. We rejected the argument. I'm sorry, Judge Berzon. Go ahead. No. All I'm saying is it would make in some ways more sense to me. But I think starting with Clapper, there seems to be some assumption that you can't have standing and therefore can't be a class member if you don't can't demonstrate that you were the person whose privacy is invaded, although that's often quite impossible. So that's why we're in this situation, right? But as the Class Formation Council, we rejected that argument about identification in Bricinio, right? In Bricino, that's right, Your Honor. There, the question was whether there was a requirement under Rule 23 that it be administratively feasible to identify the class members. And this court said there is no such requirement and went on specifically to say... It's a little different about whether there was an administrability requirement, but I don't think it matters. Either way, I understand your point. Yeah. And the specific point this court made in Bricino was, quote, courts have long employed cypre remedies when some or even all potential claimants cannot be identified. Quote, the notion that an inability to identify all class members precludes class certification cannot be reconciled with our court's longstanding cypre jurisprudence. So the court is very clearly saying that we have a cypre solution here when you cannot identify class members, and that's what is the appropriate thing to do, not to deny class certification. The last thing I would like to address in my remaining time are the arguments that have been made about the appropriateness of the particular cypre recipients that the district court selected in this case. The most important point about that, Your Honors, is that the district court had the decision-making authority on that issue. So even if it were true, and it is not, that there were some disqualifying affiliation between council or the parties in the cypre recipients, it wouldn't have any material effect because the parties and council did not select ultimately the cypre recipients. The district court did, and there's been no allegation that the district court had any disqualifying affiliation or conflict with the cypre recipients. And in addition, the district court found that there was no relationship between those recipients and class council, Google, or the court that undermines the fairness of the elementary class members. More importantly, as this court noted in Google referral, the most important was there was transparency in the process. In other words, the court was aware of all of the affiliations and had no concern that there was any fraud or collusion or anything like that. I see my time is up. Your time is up, Mayor. Thank you very much. Thank you. Mr. Willing. Thank you, Your Honors. May it please the court, I will try to be brief. I just want to make primarily two points on top of those made by Mr. Small to further explain why Judge Breyer was right to approve the parties settlement agreement. So first, I want to underscore the particular aspects of this litigation that make it an especially clear-cut case for a cypre settlement. So Judge Breyer here made an express factual finding, and I'm quoting, this is on page 21 of the record, it is unusually difficult and expensive to identify class members in this case. That's what he found. And Mr. Lowery does not argue otherwise. So under established principles, whether that's this court's decision in Lane or even the alternative standards that other courts have referenced, including the principles and Newberg's treatise on class actions, this is a paradigmatic case for a cypre settlement. And what that means is that this court doesn't need to break new ground or approve cypre settlements across the board, or really even get into a lot of the issues that Mr. Lowery wants to have the court decide in order to affirm the decision here. This is an unusual case. The second point is that Judge Breyer did not commit clear error by finding that the settlement agreement secured meaningful injunctive relief for the class. Now, Ms. Sawyer said there was, quote, nothing new in the agreement, and that's just not accurate. So in addition to extending the comprehensive privacy program and Google's obligations under it for at least two years and maybe more, there's actually a separate provision that requires additional website disclosures that go beyond what were in the ABC in 2013. And in fact, I mean, it's sort of insurance for you, as I understand it, i.e. this isn't at all cypre. I agree that it's actually not the most relevant consideration. I'm addressing it because the, primarily because the state attorney general filed an entire brief assailing the injunction, which I think can be and should be defended. But I agree that the cypre settlement here doesn't rise or fall on that issue. In my view, it rises or falls on the proposition that it's impossible here to identify individual class members in connection with a claims process. So let me just talk a little bit more about that if I could. So everyone agrees that an actual claims process that involves the sifting through of evidence and actually figuring out whether any individual had their Wi-Fi payload data collected is infeasible and impossible. So Mr. Lowry has sort of come up with this alternative, which is this self-certification idea. And the problem with is that essentially it creates a sham process. It is a process that asks people who have frankly no idea whether their actual payload data was collected to make a certification that even if taken as true, wouldn't establish the facts necessary to make them members of the class or to recover under the wiretap act from Google. So even if it were permissible, and I'm frankly not sure it would be, for the parties to have entered into a claims process settlement that had that artificial feature, it's certainly not required by Rule 23. I don't even understand how it would work, counsel. It's not like other class actions or consumer class actions where it may be difficult for somebody to certify that they remember that they bought the salad dressing or whatever it was, oil, salad oil, because it's a very small item. But in this case, it seems to me the record is we know people can't know, would not be able to know whether they're a part of the class. So it seems to me to be truly impossible, not just difficult. So that if anybody signed a statement indicating a good faith belief here would be quite qualitatively different than a good faith belief that I think I bought the Western salad oil. That is exactly right. That in all of the cases that have involved some kind of self-certification, the basic facts that go to class membership are in the possession of the class member or the potential class member. Now, maybe they're lying or maybe they're wrong, but at least they know, and if you take that, what they declare to is true, you can make a pretty good assumption that they're in the class. That is just not, as your honor recognized, that is not the case here. My understanding is there's also a problem in that the technology has changed and they wouldn't be able to demonstrate what the technology they had at the time was either. Yes. So that's an additional problem that would go to trying to figure out in this huge data set whose Wi-Fi data was collected, a threshold requirement for doing that for an individual is that they retain their Mac address or their Wi-Fi router from 2010. Which becomes increasingly unlikely. So whatever this prospect is, it's vanishing. Vanishing and creates significant inequities among potential class members because the lightning strike of who happens to have a bunch of old and outdated Wi-Fi equipment lying around doesn't really make a lot of sense as that's the thing that distinguishes who can recover from who can't. So what we have here is a paradigmatic case where the class members simply cannot be identified using reasonable efforts, non-burdensome and costly, that would essentially evaporate the fund. And so that is precisely the scenario that the Cyprey mechanism was designed for. It's totally unlike any of the cases that Mr. Shulman has relied on, or really any other case that's come before this court. And so I think, you know, without getting into the interesting and complicated questions of the outer limits of Cyprey recovery, this is a straightforward case in which it was appropriate, reasonable, fair and adequate. And Judge Breyer was right to approve the settlement. I'm happy to address any of the other issues, but I'm also happy to stop there. Your time is up. So thank you very much. Mr. Shulman, you have nine minutes and 48 seconds that you do not have to use. Thank you, Judge Verzone. There's a lot of issues percolating out there, so I want to be sure that I hit them all. You raised with Ms. Sawyer first that the idea that injunctive relief could sustain the settlement. And I think for the reasons Ms. Sawyer gives that... I'm sorry, who raised that question? I think the Judge Christian... I didn't say that. That wasn't my suggestion. I was responding to a statement or a position that the injunctive relief did not add value. Okay, that it wasn't meaningful. And I believe you raised the Campbell decision, which is distinguishable on a number of grounds. I raised the Campbell decision. I knew somebody had raised that. Thank you. That's distinguishable on a number of grounds, probably most prominently that that involved a limited waiver of injunctive claims only, not a full-fledged monetary waiver like exists in this case. Another factor there, the Ninth Circuit in a footnote there, I believe it was footnote 13, said that if it was the court of first review, it may not have considered that relief valuable, but it was deferring to the findings of the district court. And there were no such findings that the relief here was meaningful from the district court, contrary to Google's brief. The findings here were that the injunctive component was modest. That was ER 15, that it was adequate, if not the main benefit. That was ER 23. Mr. Willett and Mr. Spall, does this matter? We think it doesn't matter. If they're agreeing that it's not independently enough to sustain the settlement, then we think the court doesn't have to concern itself with it. Counsel, could you answer the position that we're just getting around to with opposing counsel, as it has developed over the course of the argument? You said that the question is, you know, 1% could come forward and get this very modest award, and opposing can't come forward. They can't self-identify. What's your response to that, under the unique facts of this case? Right. Two responses. Mr. Willett said that this fact distinguishes all the cases we've raised. That's simply not correct. As I noted in my opening presentation, Fraley v. Facebook. I think that's right. I'll give you that. But nevertheless, the district court in this case, isn't he faced with all or nothing? All or nothing in terms of what? I mean, how can you go forward the way you suggest and grant relief to even the 1% of a class that might come forward? Unlike other consumer cases, I don't see how any of these folks can self-identify. Can they? Oh, I think that they could make the same averments that the named plaintiffs made in the complaint, and that my client made in his objection, which were slightly more specific than named plaintiffs' averments. They averred that they used an unencrypted Wi-Fi connection to send and receive various types of private payload data, that their location can be seen on Google Maps and Street View, and that on information and belief, the defendant surreptitiously collected their payload data. And that wasn't good enough for standing. There was a very elaborate, very expensive, very time-consuming process to figure out whether they were right in suspecting that, right? Well, it was, both settling parties agreed at the end of the day that it was good enough for standing because they did not make public the findings of that three-year process at all, and they did not rely on them. If you look at their motion for final approval, they rely only on the averments of the complaint. I'm aware of that. So going forward, you suggest that it would be what? Anybody who comes forward, even without a good faith belief, because they can't have a good faith belief, it seems to me, going forward, to come forward, to say that they really believe that they're a member of the class, other than what? Well, they know when the, they see that their location is on Google Maps. So if they, if they were regular. That means they could be, but they still, we still don't know whether or not the data was collected, right? That's, isn't that the problem? That's correct. And we would just submit that there needs to be a parity between what's expected of the named plaintiffs and what is expected of absent class members. Okay. And in addition to the Fraley case that I mentioned, the Google Plus case involving the same defendant, the definition in Google Plus was class members that had, that had their non-public profile information exposed as a result of software bugs. And for that to happen, you can look at the complaint, that bug, for that bug to occur, people within their friend circle, within their Google Plus circle had to have authorized an app. So those class, class members wouldn't know necessarily that their people in there, they would know who was in their friend circle, but they wouldn't know that they authorized an app. Yet they opened up a claims process for, for seven and a half million dollar fund here, almost twice the size. And they got 1.8 claimants, a million claimants to come forward and distribute that to in, in, in, in a fairer process than using an all state CyPray settlement. Okay. So you have some complaints about who the actual CyPray recipients were. As far as I can tell the only one that I saw articulated was that some of these law firms were at some, some lawyer in them some point was a co-counsel with the ACLU. Is that some of it? That is the conflict that we articulated. That, that, that's a conflict of interest. And that, um, that we're at that point really wasn't addressed. Mr. Small referred to a finding by the district court, a finding by the district court, um, that, that, that, that there were no prior relationships that undermined that. Well, I noticed that in support of it, you cited some California judicial ethics, not federal, not lawyers. Um, my understanding is that if my husband's law firm co-counsels with some other firm, I don't have any problem with the other firm. Why would I? To appear in front of your owner? I'm sorry, what? Not to appear in front of me, it's not in the same case. It's some other case, some other time, some other place. Uh, well, I, I, um, I don't think they disputed that the, that ethics, ethics standards apply in federal court of the state in which the court's sitting. Not judicial standards. Oh, well, uh, yes, correct. Not directly, but for purposes of law. Uh, and the only court, well, the only court to decide whether that was a disabling conflict with the Northern district of California judge or in the Knapp decision. And he concluded that it was a disabling conflict. Um, so, and, uh, the, the, the finding below that, that it didn't undermine the fairness. That was a conclusory finding. It, it in a footnote relied on lane, but lane is a qualitatively different case because that involved a conflict with the defendant and the rationale by which this court sanctioned. Um, that conflict permitted it rather was that, uh, the, the settlement is the offspring of compromise. So of course the defendant's issue interest should get taken into consideration settlement, but class counsel's interests should not in the same way. Otherwise it's essentially a second supplemental fee award if they're benefited by it. They, they, they, uh, do you mean that the district court had the ultimate decision because class counsel proposed it and it was not altered other than to add in one more recipient who would have applied independently. They nominated and the court selected. Right. Right. And they nominated ACLU after receiving an application from ACLU after having this prior conflict of interest with ACLU. Uh, one other thing I want to mention is, um, Mr. Willen referred to, to our proposal of self-identification as what would be a sham process. But in fact, Google wants to take the benefit of having all of these class members. They want a 60, they, they want to have the by their lights. They wouldn't, none of those individuals would be even able to tell that they were members of the class. So how could they meaningfully exercise their right to, to opt out of the settlement, um, to object to the settlement? Well, why not? I mean, you can opt out such that I know if, even if I were able to prove this, I don't want to be part of this class. Uh, I, I'm just taking the defendant, their face value. The defendant says that receive under the defendant's view upon receiving notice, they would have no way of knowing whether they were a member of the class. So that goes back to what I regard as the artificiality of this whole notion that any individual has to demonstrate that, uh, that, that it was their data. Their problem is that it might've been their data and they don't like it. I mean, that's, uh, you know, I don't like these cars going by my house and, and possibly picking stuff up whether they actually pick stuff up, uh, ought not to matter under the case law. It turns out it does matter perhaps. Um, but, um, still people can have an interest in a lawsuit. Um, uh, well, they could pose their concern that, that it's perfectly possible that their data was picked up. They could have defined the class in a way that would have captured people whose, whose, whose locations or whose Google street view, uh, in an objective way that people would have been able to. I wonder what would happen to a whole clapper argument about whether or not these people, uh, actually have their privacy invaded as opposed to, um, were concerned that they had their privacy invaded. In any event, um, your time is up. If you have anything you're dying to say, you can say it. No, nothing further, your honor. Thank you. Thank you very much. Thank all of you for very helpful arguments in this very interesting case. Uh, the case of Jaffe versus Google has submitted and we are in recess. Your honor. This court for this session stands adjourned.
judges: Berzon, Christen, Bade